IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

FILED

2007 APR - 3  DB

U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN.

IN RE LELLA V. MOSS

No: **2  0 7    0 0 1 2**

Lella V. Moss
by agent and  next friend
Tommy Moss
individually and as agent of Lella Moss
Other Children of Lella Moss,
Grandchildren of Lella Moss
Eldon Moss, Danny Moss, Linda Harris and Wesley Moss are appointee
agents and appointee Trustees of Lella Moss under Power of Attorneys,
and her trust.

**JUDGE TRAUGER**

v.

Tennessee Department Human Services, TN DHS
Francis Bass, Jr. individually and as attorney TN DHS
David Hawthorne, Individually and as agent TN DHS APS
Linda Terrell, Individaully and as agent TN DHS APS
UNKNOWN TN DHS APS Commissioners, Supervisors, Attorney, also
individually
Kelly Tayes, Individually and in Capacities of Conservator, Trustee
appointed to by TN DHS APS and approved by the court
Michael Collins, individually and appointed attorney for Lella Moss
Cookeville Regional Medical Center (CRMC), Cookeville Tennessee
John Beal, Attorney CRMC
C. K. Smith, witness

\*\*TN DHS APS means Tennessee, Department Human Services, Adult
Protective Services

PARTIES

   The Plaintiffs in this case are individuals. Lella Moss and her six
children are residence of Jackson County, Tennessee. There are 12
grandchildren, 7 of which are residence of Tennessee, 5 reside in other
states

   The defendants are employes of the Tennessee Department of Human
Services or individuals acting under appoitment by the State of
Tennessee through it Court. It its believed that all defendants reside
in Tennessee.

JURISDICTION AND VENUE

. This case arises under the U.S. Constitution and the laws of the
United States and presents a federal question within this Court's
jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331
and 28 U.S.C. § 1343(3)(4). It seeks remedies
under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and
F.C.R.P. 65.

. Venue is proper in this district under 28 U.S.C. § 1391(b).

                    Summation of Cause

.  Lella Moss created a written Power of Attorney for Health, a durable

power of attorney for finance and a revocable trust dated, signed and notarized in 2003. She became disabled due to cancer in 2007 at which time the agents she had appointed were empowered to act on her behalf to make medical decisions, manage her assets and perform the duties assiged by her as trustee under her trust.

. The Tennessee Department of Human Services and/or the individual woring in that department failed to honor her written directives and insisted that professionals manage the final days of Lella Moss. The parties failed to honor her written power of attorney for health and in cooperation together and individually brought action in Tennessee Courts to void all the written directives and plans of Lella Moss in order take over her assets and manage them, force on her their desired medical treatment and remove all of the people Lella Moss had given legal authority to act for her and comfort her in her final days by substituting their idea of "her best interest". These ill-willed individuals have been given the right to extract payment for their performance from Lella Moss and Her beneficiaries.

. Lella Moss claims that these acts are a violation of her constitutional rights and state rights. Certain of her children and grand children claim that this is a violation of their constitutional and state rights. All parties claim to have suffered loss as a result of these acts under color of law.

FACTS

Lella Moss is a woman who worked for 40 years sewing and inspecting shirts for Tennessee Clothing manufacturer. She is and was thrifty and self-sufficient. She raised and canned most of the food eaten by herself and her family. She continued vegestable gardending until about 2004, age 88. She raised 6 children and loves each of them. Also during this time she managed to save $300,000 and have a farm valued above $500,000.
In addition Lella Moss was a deeply religious person, holding on the the expection that one day she would be with God and free from the troubles of life here.

She began to plan for the distribution of her assest upon death with typed wills and trust writing dating back to 1983. She continued to revise her estate plan until declared incompetent in 2007 and placed in State Protective Custody February 8, 2007. Her planning at that time included these written documents: a power of attorney for health dated in 2003, a durable power of attorney for finance dated in 2003 and an amended revocable trust dated in 2003. Each of these documents named successors in the event a named person could not serve. These documents were notarized. These tools were by no means the only options she considered using to carry out her responsibility.

Her estate planning evolved around two issues: (1) keeping lawyers out of her affairs and assuring that her children would have no incentive to go to lawyers because of the lost of wealth she had seen from lawyer involvment in family asset transfers at death. She had struggled and done without lugury items so she would have more to give to her chosen heirs and to set an example of thrift for her children. (2) secondly, she want to make sure that "her PLAN" as she envisioned it would be carried out without by her chosen people.

In 2007 Lella Moss was made a ward of the State of Tennessee in contradition to her Plans and written instructions and the objections of her chosen agents. Her plans were changed into Individual Plans of

the State Actors who could and must perform "in her Best Interest". A nice legal phrase in this case that means, "it will be done our way".

Lella Moss provided her son, Eldon Moss, a place to live on her property during his entrire adult life. For a period of time he engaged in farming using some of her proprty for his benefit. She also supervised and often cooked for his two boys before and after school following Eldon Moss's divorce.

Lella Moss provided her son, Bobby Moss, a place to live on her propery during his entire adult life. During this period he enaged in raising tobacco, selling cars and other items for profit, and selling cattle for his benefit. During his divorce he moved out of the house Lella Moss had provided him for about 25 years. He moved into the residence home of Lella Moss which she share at that time with Linda Harris and her two children. He remained there until about 01/21/2007. At that time Tommy Moss would not let him enter the home until he had come to an agreement with him about his conduct and use of the property.

Lella Moss provided property and a house for her daughter, Linda Harris, to live in or on from the time she was married until the time of her divorce. At that time she and her two small children moved into the residence of Lella Moss and her living husband at that time. Linda Harris lived with Lella Moss until 2005 or 2006 when she voluntrily moved from the residence because of the family differences. Lella Moss also helped her by supervising her two children and cooking for them.

Lella Moss has provided her son, Danny Moss, with a place on her property to live for about 15 years. He is currently using some of her property for raising cattle for his benefit. Prior to that Danny Moss provided these items from his own resourses.

Lella Moss provided her son, Tommy Moss, with funds to attend college. After college Tommy Moss lived from his own resourses. Tommy Moss came to visit Lella Moss for an extended period in about 2000.

Lella Moss provided her daughter, Nola Moss, a car when she graduated from high school. Nola Moss married and lived on her own resources until she returned to live with Lella Moss. Lella Moss provided her a place to live from about 1999 to 2005.

Tommy Moss was left as the only person providing daily assistance to Lella Moss when Linda Harris moved.

His assistance was primarily house cleaning, cooking, buying food, writing her checks to pay 4 or 5 monthly bills ( which she signed), depositing her checks in the bank and providing advice on issues from time to time.

In 2001 Lella Moss asked Tommy Moss to stay with her so he could provide her with help and support. She never specified specific reasons why she made the request.

Tommy Moss agreed to do so with the understanding that Lella Moss might have to make some financial contributions to his up keep if it became necessary because of his limited resourse.

Part of the agreement Lella Moss made with Tommy Moss was that he could live at 140 Sugar Town Ridge Lane for an additional 5 years following her death and that he could receive mail at the location using an

address of 200 Sugar Town ridge lane.

The above request was reaffirmed by Lella Moss several times in 2005 and 2006 when Tommy Moss offered to move as a solution to the continuing opposition to his presence and assistance of Lella Moss by Bobby Moss, Nola Moss and Linda Harris.

Lella Moss explained to Tommy Moss on numerous occasions that Eldon Moss, Bobby Moss, Linda Harris, Nola Moss or Danny Moss made no payment toward property taxes, paid no rent, paid no share of any farm or other profits they earned from using the farm, paid her nothing for her food or living expenses.

She was very much aware of how her children felt about her and responded to her care and provision. "My children fails to honor me" she would say occasionally.

Lella Moss allowed Tommy Moss to pay the phone bill after he moved in because of the addition of internet service and business long distance. This agreement came about because of the way she insisted that the phone service be handled. She insisted that there would be no second phone line installed.

Tommy Moss paid for his food until late 2005 when Bobby Moss began to consume and use a lot of purchased food.

Prior to 2005 Linda Harris and Eldon Moss did assist Lella Moss with labor to clean the residence, cook, yard mowing, repair water lines and appliances,

The assistance provided by Lella Moss to her children did not mean that she blindely believed or pampered her children. She enjoyed helping her children with the things she could which did not take away from her own financial security.

She was a person who did not accept personal gifts. She often refused any help if she could manage to do something on her own.

She told Tommy Moss several times about how she had come to have absolute trust in Eldon Moss. She had tested him several times with money when he was in a financial bind to see if he would steal from her. She said he never took a penny.

She did not tell Tommy Moss how she had tested the integrety of the rest of her children.

Lella Moss made changes in her estate distribution plan over these years that indicated to Tommy Moss that some of her other children had failed her test.

BOBBY Q. MOSS

In 2003 Bobby Moss received a head injury at work. The brain injury was so severe that it resulted in about 10 days of critial care at Erlinger Hospital before danger from swelling ended.

The head injury resulted in Bobby Moss being eligible for disability benefits through Social Security.

A requirement of Social Security regarding payment of disability benefits is that a conservatory act a the payee to manage the use of

the funds paid.

During Bobby Moss injury Tommy Moss and Eldon Moss spent a great deal of time on matters related to Bobby Moss.

These matter included taking him to doctors and social security examiners appling for social security disability. This assistance was done without compensation.

During his about 4 month stay at Maybry Rehibilition they visited him at least twice per day.

When Mabry began to consider moving Bobby Moss to a faciity which could handle agressive patients, Tommy Moss and Eldon Moss began to take Bobby Moss to Lella Moss's home in a effort relieve Mabry personnel and to try to reduce the agression of Bobby Moss so that he could stay at Mabry until discharged by his doctor.

Bobby Moss was required to get a conservator to manage his disability benefit payment from Social Security. Tommy Moss acted as the first conservator. Lella Moss replaced Tommy Moss as the conservator and was serving in that capacity when hospitalized in 01/2007.

Tommy Moss was replaced as conservator by Bobby Moss for these funds because Tommy Moss would not give Bobby Moss full access to the social security funds as they were paid monthly.

Tommy Moss notified Social Security in the fall of 2006 by letter that Lella Moss was not capable of acting as a conservator for Bobby Moss. Social Security Checks for Bobby Moss continued to be mailed to Lella Moss through 01/2007.

Bobby Moss had an attorney appointed as his guardian ad litem in regard to money he received from an insurance company related to his head injury in August 2005.

Bobby Moss has a sealed conservatorship file in Putnam County Clerk of Courts office in Cookeville, Tennessee.

Bobby Moss stopped meaningful conversation with Tommy Moss in 2005 when Tommy Moss attempted to talk Bobby Moss into going to counseling or join a self help group because of the family discord he was causing at home and possibly elsewhere.

See Bobby Moss Conduct later

NOLA MAI MOSS VISITS AND COMPLAINS

Lella Moss let Nola Moss move into her residence at 140 Sugar Town Ridge Lane prior to Tommy Moss living at the same residence.

Nola Moss shared the residence with Linda Harris, Linda's two children, Bobby Moss and Lella Moss.

Lella Moss required Nola Moss to leave her residence at 140 sugar town ridge lane after Nola Moss caused so much discord with herself, Linda Harris and Linda Harris children.

Lella Moss decided shortly after Nola Moss had moved out of the residence to let Nola Moss move into the house formerly lived in by Bobby Moss so she could help Nola.

At the time Lella Moss made the offer to let her move into another
house she owned, Nola Moss was living in a motel.

Nola Moss moved into the house. She began to cause discord in the
family again by demanding that her brothers tell her about all actions
and business taking place around the house she moved into be reported
to her in advance so she know about it.

She insisted that she be told: who was mowing the hay or pasture; who
was comming to buy cars or junk; when Bobby Moss or Eldon Moss was
going to be using the barn. She also insisted that the entry gate to
the barn be locked at all times.

At about this time Tommy Moss came home to visit with Lella Moss and
his siblings.

Nola Moss had a daily routine of calling or visiting Lella Moss at her
house to tell her that 'the boys were taking advanage of her ( Lella
Moss)' and that Lella Moss 'was not treating the girls fair'; 'Lella
Moss was for the boys'.
The word boys refered to her four brothers at this time.

The routine went on from about 2002 throught her removal by the courts
in 2005. After that Nola Moss repeated the above accuation by phone
often and in person at the times she visited.

During the period from 2003 to 2005 sheriff deputies came to Nola Moss
residence several times late at night.

Lella Moss ask Nola Moss to move a second time because she became tired
of the same daily interferance in her business and arguments in the
family caused by Nola Moss's demands regarding property use, and Lella
Moss preferences.

Lella Moss took court action to have Nola Moss removed from her
property when she refused to move on her own inititive after being
asked to do so.

Lella Moss ask Tommy Moss to do what needed to be done to get Nola Moss
off the farm. Lella Moss signs the check to pay attorney Bobby Ellis
$500 to handle the legal requirements.

Bobby Moss took Lella Moss to court on the last two hearing held to
have Nola Moss removed from the property. The last hearing was in June
of 2005 at which time the order was entered.

Nola Moss did not leave the property until 07/07/2005 the last day
given by the court order to vacate the property.

Lella Moss had been advised infrequently by Tommy Moss that it was not
wise for her to allow Nola Moss to come to her house before she was
removed from the property because of the anger, cursing and
confrontation Nola engaged in with Lella Moss and other present family
members.

Lella Moss was advised infrequently by Tommy Moss that it was not wise
for her to allow Nola Moss to visit her home after she had to be
removed from the property by court order.

Lella Moss ignored this advise.

Lella Moss permitted Nola Moss to visit her at her home when she was able to supervise and visit with her.

Nola Moss made repeated request and demands to Lella Moss in person and by phone for information about how Lella Moss had planned to distribute her assets after she died.

Lella Moss ask and told Nola Moss repeately to stay out of this aspect of her business.

Lella Moss repeated this request 'to stay out of her businesss' to Nola Moss from the time Tommy Moss came to visit Lella Moss until 12/2007.

Nola Moss was told repeatedly by Lella Moss that she ( Nola Moss) she was free to stop visiting any time she wanted to if she did not like how Lella Moss took care of her business.

Lella Moss did not discuss the details of her estate or personal or financial plans with Nola Moss at any time Tommy Moss is aware of.

This routine conversation about Lella Moss's plans usually included a repeat of the same subject matter by Nola Moss: the boys are taking advantage of you; you treat the boys better than you treat the girls; Tommy Moss and Eldon Moss cannot be trusted; Tommy Moss keeps me away from you; who is going to take care of your business when you die; Tommy Moss choked me and you did nothing about it; Tommy Moss is controlling you.

Nola Moss oftern would include in her conversaton with Lella Moss an accusation that Tommy Moss was stealing her money from the bank.

During phone conversation Lella Moss would ask Nola Moss to talk about something else beside her routing conversation as describe above. Lella Moss would hang up the phone when Nola Moss continued with the same objectionable conversation topic. Lella Moss hang up often on call to her from Nola Moss.

Nola Moss made phone call to Lella Moss at least twice per week. On some days she made 20 to 30 call in an attemtp to talk to her when Lella Moss was asleep, away or refused to talk to Her.

CONTINUAL ASSAULT ON TOMMY MOSS

The assault on Tommy Moss continued in other ways:

Nola Moss accused Tommy Moss of assault in 05/2005 a day after she made a stop at the home of Lella Moss without visiting.

The charging affidavit was completed by Jackson County clerk of court using infromation provided by someone else. The unsigned charging affidavit by Nola Moss gives a date of birth for Tommy Moss as 12/23/1952. The affidavit also said that it was completed pursuant to the direction of the assistant district attorney.

At a hearing before Judge cassety, the fact that the affidavit was unsigned along with other deficiencies was shown to judge Cassety along with the fact that there were no other witnesses to this aledged assault so the charge would be dismissed.

Tommy Moss ( acting pro se) was found guilty by Judge Cassetty and

sentenced to 11 months 29days good behavior.

TOMMY MOSS CHARGED WITH CRIMINAL IMPERSONATION

Tommy Moss was charged with criminal impersonation about two months after the time the incident aledegely accured. He is accused by Cynthia Shuttles of giving a false date of birth and giving a false social security number when booked on the assault charge made by Nola Moss. The Date of birth in her affidavit is the same as the date given in the affidavit of Nola Moss charging assault. The source of the Social Secrity Number is beleived to have come from Cynthia Shuttles.

Cynthia Shuttles is a deputy and mother of an out of wedlock child, per local news.

Sheriff Kenneth Bean is believed to have admitted that he had fathered Cynthia Shuttles child.

Nola Moss visited Cynthia Shuttles at the jail while Tommy Moss was jailed there.

Sheriff Kenneth Bean held Tommy Moss in jail 20 days without giving him a copy of the charges against him and without the written bonding conditions which are on the same document.

Sheriff Bean through his deputies demanded that Tommy Moss give him a date of birth and a social security number in addition to a $1000 bond before he would get a copy of the charging affidavit and be let out of jail.

Bobby Moss told Tommy Moss that he would take care of getting the bond. After 20 days he had failed to pay the cash bond and had interferred with Lella Moss suppling the funds to pay the bond. Bobby Moss had told Tommy Moss repeadedly that the sheriff and clerk of court had told him that he had to give a social security number and date of birth before he could get out of jail.

Tommy Moss was bonded out of jail when another person made a cash bond at the clerk of court office without providing any other information.

At three appearances before Judge Cassetty during this 20 day period, Judge Cassetty was told of the violations of these constitutional rights and yet he refused to order the clerk or sheriff to supply the charging affidavit to Tommy Moss.

The charge of criminal impersonation against Tommy Moss was dropped by the state of Tennessee.

During this period Tommy Moss attempted to get a domestic restraining order against Nola Moss with the help of an attorney. In fact two temporary hearings were held on the matter before Judge Cassetty during the 20 day period Tommy Moss was jailed.

Judge Cassety ruled following a hearing that the application for the restraining order did not aledge facts which warranted a restraining order.

The timing of the arrest on criminal impersonation charge was deferred by the Sheriff from the date he aledged that the act was committed until a day or two before the first scheduled hearing on the Protective Order request against Nola Moss was scheduled.

This was a period of about two months days.

BOBBY MOSS CONDUCT AND INTRUSION

Bobby Moss made repeated attempt to talk with Lella Moss about her plans for the distribution of her assets upon her death throughtout the period he lived at her residence.

Bobby Moss began to engaged Lella Moss in a conversation on a weekly bases regarding the plans she had for her assets when she died from 2005 to 2007.

Lella Moss did not give him any information at any times about her estate plan when Tommy Moss could hear their conversation.

She usually ended the inquiry of Bobby Moss about her estate plan by telling Bobby Moss, "I take care of my stuff. If you want to take care of something, get your own place.".

Bobby Moss asked Tommy Moss several to help him get Lella Moss to make plans to distribute her assets.

When Tommy Moss told him that was Lella Moss business and he could not interferr in the discussion, Bobby Moss would get mad at him.

Lella Moss could have told Bobby Moss, Nola Moss, Linda Harris or Danny Moss all about her estate plan when they visited her in person or made phone calls to her if she had chosen to do so.

Tommy Moss did not discuss Lella Moss business with Bobby Moss, Nola Moss, Linda Harris or Danny Moss.

Some of Lella Moss's tools and personal items became missing during this period. This was brought to the attention of Lella Moss by Tommy Moss and Eldon Moss.

Lella Moss told them regarding the missing items that, "it was bad" and "you stay out of it I will take care of it."

When it became apparent to Tommy Moss that Bobby Moss was the person taking items he reported this to Lella Moss. She told both Tommy Moss and Eldon Moss to stay out to these matters becasue she 'would take care of it.'

Tommy Moss and Eldon Moss on many occasions heard Lella Moss ask Bobby Moss to return missing items or return farm equiptment.

Bobby Moss begin to directly involve Nola Moss in 2006 in his determination to get information about what Lella Moss was going to do with her asset after she died.

He brought Nola Moss to visit Lella Moss.

He asked Lella Moss to let Nola Moss move into the residence with them.

Lella Moss refused to allow Nola Moss to move into her residence.

He carried on almost daily phone conversation from 140 sugar town ridge

with Nola Moss.

Bobby Moss aslo was engaging in acts which caused discord in the home and arguments with Tommy Moss and Lella Moss.

Some of the things Bobby Moss did were: parking junk cars around the Lella Moss home, blocking Lella Moss flowwer with tomatoes plants, cutting Lella Moss landscape shrubs, piling up items on flowers, blocking the entrance to the garden, and making farming equiptment unusable or unavailable for use by Tommy Moss, bringing a dog into the house, not cleaning up after himself or his dog, place food items he bought in the cabinets where Lella Moss had kept her food items for years, and taking light bulbs out of light fixtures and moving furniture when Lella Moss asked him not to.

Bobby Moss was asked many times by Lella Moss not to engage in the above acts or to correct one the acts.

Bobby Moss would get angry at Tommy Moss when he brought up the unexceptable conduct (those above) that had not been corrected and would invite Tommy Moss to fight with him.

The invitation to fight was usually made in the presence of Lella Moss.

Bobby Moss was caught several times by Tommy Moss while he had Lella Moss's safe unlocked without her permission.

Bobby Moss had not engaged in the type of conduct described above in the presence of Tommy Moss until around 2004.

Bobby Moss also began to tell Lella Moss on a routine basis that she sould not trust Tommy Moss or Eldon Moss.

Nola Moss, in person and by phone, constantly complained to Lella Moss that Tommy Moss should not be in charge of any of her business, because no one trusted him and he had taken her money from the bank.

In early December, 2006 Bobby Moss had engaged in some conduct to provoke Tommy Moss into an argument and/or physical confrontation. Tommy Moss asked Bobby Moss who was advising him on how to get him set up for assault and battery charges. Bobby Moss responded by saying, "don't you worry. It will be legal."

Tommy Moss advised Lella Moss on several occasions that it would be wise for her to require Bobby Moss to move back to his old residence across the road because of the discord he was causing.

Lella Moss refused to take this course of action.

BOBBY TAKES LELLA MOSS FOR CAR RIDES

The activity that Lella Moss engaged in with Bobby Moss from 2005 on that she rarely did with other family members was to go with him on a car ride. He would drive on roads around the residence.

This activity began to trouble Tommy Moss in 2006 because Bobby Moss actions toward Lella Moss were beginning to appear as forms of conditioning to discourage Lella Moss from opposing his conduct and reduce her will to object to his conduct.

Bobby Moss would yell and curse at her when she asked him not to do

something.

Bobby Moss also began to get Lella Moss to sign blank sheet of paper saying that he needed it to get work done.

Bobby Moss got her to sign a document in 01/2007 while she was in bed. After a few minutes had elapsed she come into the kitchen and asked for the signed document back. Bobby Moss refused to give it to her then or the next day.

Lella Moss stopped informing Tommy Moss in 12/2006 that she had been on a car ride with Bobby Moss.

Tommy Moss learned of one drive after that date that Lella Moss took with Bobby Moss that lasted about 8 hours. When she and Bobby Moss was questioned about what they had done for the 8 hours neither of them would discuss it.

It is believed that Bobby Moss had taken Lella Moss to Crossville, Tennessee during this 8 hour period of time.

It is believed that Bobby Moss took her to a doctor while in Crossville that day.

It is believed that Johnny Moss provided assistance in arranging the doctors appointment in Crossville, Tennessee.

It is also believed that Tennessee Adult Protective Service Agent also participated in planning the Crossville, Tennessee doctors visit.

Tommy Moss advised Lella Moss to stop taking car rides with Bobby Moss in 12/2006.

Bobby Moss's behavior and conduct pointed to the fact that he could no longer be trusted to do what Lella Moss asked him to do.

Lella Moss did not listen to this advice.

LELLA MOSS RESPONSE TO ALL OF THIS

In several disucssion that Tommy Moss had with Lella Moss about all the discord and the advisability of Tommy Moss continuing to help her, Lella Moss insised on the folloing items each time:

1. that she would handle Nola Moss and Bobby Moss
2. that she knew both were lying about Tommy Moss and Eldon Moss stealing
3. that she trusted Eldon Moss and Tommy Moss
4. that Tommy Moss and Eldon Moss were not to get involved in arguments she had with Nola Moss and Bobby Moss over missing property or conditions they created as she would decide what to do about their conduct.
5. that their fussing did not bother her and when she got tired of it she would make them shut up and leave.
6. She trusted Eldon Moss and Tommy Moss regardless of what Bobby Moss and Nola Moss said bad about them.
7. she could not understand why they wanted to have their noses in her business and were trying to tell her what to do.

Lella Moss also began to indicate to Tommy Moss that she was ready to

make Bobby Moss move because she was tired of his conduct and disrespect.

Whenever Lella Moss did not want to speak to Nola Moss on the phone she instructed Tommy Moss to tell Nola Moss that she was in the yard, asleep, or gone.

Many times she was actually engaged in one of these activities when Nola Moss called.

Whenever Lella Moss tired of the topic of a phone conversation with Nola Moss she would end the conversation by hanging up the phone abruptly.

I have hear her ask Nola Moss many times to talk about something else besides "same ole shit" just prior to hanging up.

Whenever Lella Moss tired of the conversation with Bobby Moss she would go to sleep, ignore him or become so angry that she would tell him to get out of the house.

Tommy Moss has seen her so angry at Bobby Moss that she would try to stike him with her fist.

Lella Moss showed no sign that the activity or Bobby Moss or Nola Moss were influencing her decisions or routine prior to December 12, 2007.

When ever Bobby Moss or Nola Moss would attempt to engage Tommy Moss or Eldon Moss in physical confrontation, Lella Moss would force ( by verbal demand) one of the parties to leave.    If it was Tommy Moss or Eldon Moss who was asked to leave she usually would say to them 'just leave and let me take care of it.'

Lella Moss became very upset physically and emotionally whenever Eldon Moss or Tommy Moss attempted to assist her in correcting the conduct of either Nola Moss or Bobby Moss by becoming involved in the discussion. Her physical response at these times included heaving breathing, chest pains, and anger at Tommy Moss and Eldon Moss.

Lella Moss was advised by Tommy Moss in early 2002 regarding Nola Moss and in mid 2006 regarding Bobby Moss that she should not permit Bobby Moss or Nola Moss to come around her because the main conversation engaged in with them was against what she wanted to do, the people she had selected to help her and because of their refusal to honor her request to stop interferring in her busishness.

Lella Moss responded to this advice by telling Tommy Moss that she could handle them and that their talk did not bother her.

She has also told Tommy Moss and Eldon Moss that It was her business how she dealt with Bobby Moss and Nola Moss and she would do whatever she wanted to do.

Lella Moss did make changes in her estate plan over this period of time.

PHYSICAL CARE OF AND ACCESS TO LELLA MOSS

After Linda Harris moved from the residence of Lella Moss, Tommy Moss did the grocery shopping, house cleaning, cooked most meals, did the yard work, and gave personal grooming assistance of Lella Moss.

Personal grooming assistance in 2006 included washing her hair, painting her fingernails, and trimming her nails.

Lella Moss rejected any attempts by Tommy Moss to help her clean her room (other than normal house cleaning) or clothing or her person. She was able to and did take care of these activities on a regualr basis.

Lella Moss also washed the clothing of Bobby Moss up until November 2006.

Tommy Moss never had exclusive access to Lella Moss.

Eldon Moss visited or called daily for as long a period of time as he chose.

Danny Moss visted at least weekly for as long a period of time as he chose.

Bobby Moss lived and slept there and had daily conversations with Lella Moss.

Nola Moss call almost daily and visited about once per week after July 2006.

Nola Moss visits after July 2006 lasted from one to two hours.

Linda Harris call weekely after she moved from the residence.

Friends of Lella Moss would come by about twice per month.

The Jehovah Witness team came by almost every week.

Tommy Moss would be gone from the residence of Lella Moss at least one night and two day per week in 2005 and 2006. Lella Moss had one son living with her and two sons within her walking distance to talk to as she chose or they chose.

Tommy Moss worked at a home office located in the basement of the house. He worked for several hours at a time. During this time Lella Moss was upstairs, outside the house, and free to what ever she wanted to do( which she did at all times until abducted).

In addition to these regular visitors:,

Johnny Moss, a grandson and nurse at Cookeville Regional Medical Center and at a Crossville hospital prior to that, would come to see Lella Moss about every three months for an hour or so.

Junior Moss, a grandson, would come to visit for a few hours about twice per year.

Lella Moss had a great deal of affection for these two grandchildren along with the children of Linda Harris.

These four grandchildren grew up at Lella Moss home. She spent a great deal of time feeding them, babysitting them and had daily contact until they moved to other communities as adults.

After Lella Moss was discharged from the hospital on 01/19/2007 she was visited by relatives (excluding children) and friends on five or more

occasions before being abducted on 02/08/2007. More visited were
planned by these relatives and others prior to the abduction.

MEDICAL CARE OF LELLA MOSS

Lella Moss has a record of cancer dating back to about 1970. She
received chemotherapy and radiation treatments for brest and cervical
cancer from Vanderbilt hospital in Nashville, Tennessee. She also had
breast removal surgery as part of the treatment. Following her
recovery from the treatment she made it known to Tommy Moss and other
children that she did not want to have any kind of treatment for cancer
if she was diagnosed with the disease again.

Lella Moss refused to go with Tommy Moss to a cancer center or
specilist for annual cancer examinations from 2000 to 2007. It was
difficult to get her to go to a doctor for any condition. She refused
to get eye exams, cataric exams, or have a better fitting set of false
teeth made.

Tommy Moss took Lella Moss to her to regular medical provider, Cheryl
Focer, from 2000 to 2002. During this period she had x-rays,
cardiogram and prescriptions for high blood pressure. The x-rays were
mostly to detrmine if lung infections had cleared enought to
discontinue prescribed medication. The cardiogram was done because she
routinely complained of chest pain.

Tommy Moss was told by Cheryl Focer that Lella Moss had a degenerative
heart condition and that there was not anything that could be done to
improve her heart condition.

Lella Moss had intestinal surgery to correct blockage caused by scar
tissue in about 2002. This was successful and the blockage did not
reoccur.

Lella Moss would not let anyone take her to the doctor for three or
four days when her intestines became blocked at the start of this
medical condition. She finally agreed to let Eldon Moss take her to
the emergency room when the effects of bowel blockage kept getting
worse.

Nola Moss wanted to take Lella Moss to the doctor in 2004. Lella Moss
left home with Nola Moss in good condition and for a routine office
visit. She ended up in the Cookeville Regional Medical Center
(hospital). Nola Moss took her to a new doctor without telling anyone
the appointment she was going to was with a new doctor. After a
hospital stay of two days, Lella Moss was released. Tommy Moss
continued to take Lella Moss to the new doctor, Doctor Pruzan, mostly
for follow up on blood pressure medication.

Tommy Moss inquired of Dr. Pruzan on a scheduled visit as to why Lella
Moss had been hospitalized by her, she said, that Nola Moss had acted
so demanding and concerned about her mothers condition that she
hospitalized her as a precaution, especially since it was the first
time she had seen either person.

Tommy Moss continued to take Lella Moss to the same clinic. The three
doctors
who saw her left the clinic within a year or two after seeing Lella
Moss. The last Doctor to see her at the clinic was Dr. Wolfer.

At a scheduled medical appointment with DR. Wolfer to extend the high

blood pressure prescription, Dr. Wolfer wanted a thyroid test done on Lella Moss. The test was scheduled at the CRMC. On the scheduled day Lella Moss refused to keep the appointment or to schedule a new appointment. She refused to change her mind on the subject when asked after a day or two.

Tommy Moss called several other doctors during 2004 and 2006 to try to change doctors but each attempt to change ended because the called Doctor was not taking new patients or they did not take anymore medicare patients.

Changing doctors was also difficult becasue Lella Moss often refused to go to a scheduled appointment.

Tommy Moss had plans to take her to another clinic on the next office visit Lella Moss would agree to go to because they began to accept blue cross insurance coverage.

In July 2006, Lella Moss developed constipation that required a trip to the emergency room at CRMC because she refused to go to a doctors office timely.

She was seen by DR. Savage.

Tommy Moss asked Dr. Savage to run extra test on her to determine her health condition while she was there.

Dr Savage reported that the results of the test showed she was in good health for a 90 year old.

Lella Moss was sent home from the emergency room after getting relief for her bowel problem.

On this medical expedition, Bobby Moss insisted on driving Lella Moss to the hospital in his truck. Eldon Moss drove Lella Moss home in his car.

ANOTHER FAMILY MYSTERY

Another family medical mystery occured around December 2007. Johnny Moss, a nurse and favored grandson, asked Tommy Moss if it would be alright if he made an appointment with one of his doctor friends in order to try to get Lella Moss help with the pain in her knees that she was complaining about. Lella Moss agreeed to go and Tommy Moss agreed to the plan. The plan was to have a specilist in arthritis look at her knees and help with the pain if he could.

On the appointed day, Johnny Moss arrived early. He begain to rush Lella Moss to get into his truck so they could go quickly. He complained about being rushed for time because of a gas carberator he had to work on and other things he had to do. He then stated that he did not want Tommy Moss to go with them to the doctor.

Tommy Moss decided that his behavior was so out of the ordinary and threating and Johnny was so rushed for time that it would was not advisable for Lella Moss to go anywhere with him alone.

Johnny stated that he had talked with Bobby Moss earlier by phone and Bobby Moss had agreed not to follow him to the doctor and that he did not want Tommy Moss to go because Tommy Moss would be an embarrassement to him.

When Tommy Moss insisted on going to the doctor with Lella Moss, Johnny Moss became angry and ordered both Lella Moss and Tommy Moss out of his truck and drove off.

Johnny Moss told Tommy Moss at that time that he was not going to attempt to help with Lella Moss medical needs any more.

He later became involved again in her medical business.

MORE FAMILY MYSTERY

On about 01/08/2007 Lella Moss exited her residence by a side exit with Bobby Moss after having gone to the back bedroom with him so they could avoid Tommy Moss.

When Tommy Moss asked her where she was going, she and Bobby Moss said they were going for a car ride.

Tommy Moss asked her not to go with Bobby Moss but she went anyway.

Tommy Moss waited until they drove passed the house from a dead end steet in an effort to get Lella Moss to change her mind. She showed no sign of unwillingness to go with Bobby Moss.

This was very unusual conduct for Lella Moss at 8 A.M. as she had not slept during the night.

Lella Moss had spent most of the night awake and had coffee with Tommy Moss several times during the night.

Tommy Moss wondered what was the motivation for her to go for a car ride.

Shortly after this car ride, Bobby Moss informed Tommy Moss that medical test had been done on Lella Moss and that he had gotten the results that day. According to him the test show that she had Cancer 'real bad'. He asked me not to tell Lella Moss about the test.

According to some medical reports recieved later by Tommy Moss, Lella Moss saw a doctor in Crossville, TN in January 2007.

On Tuesday, January 9, a secretary from Dr. Sidrys office called the house and left an appointment messsage on the phone answering machine for Bobby Moss. The message was that Lella Moss had an appointment on about 01/12/2007.

The day before the apointment Johnny Moss called to say that he was helping to take Lella Moss to this appointment.

His brother Eldon Moss, Jr. drove up from the Memphis, Tennessee area to help Johnny take her to the doctor.

Tommy Moss asked Lella Moss about the doctors appointment that night. She said that she was not going to any doctor.

On Thurday morning, Tommy Moss asked Lella Moss again about going to the doctor with Johnny Moss. Lella Moss again told Tommy Moss that she was not going any where that day, especially to see a doctor.

PHYSICAL AND MENTAL CONDITION OF LELLA PRIOR TO THE APPOINTMENT

PAIN throught 01/10/2007: Lella Moss had complained of pain in her sholder area, her knees, and her head for over a year. She refused to allow a medical appointment to be made by Tommy Moss, Eldon Moss or Bobby Moss to see if she could get relief from the pain.

Asprin was the only pain medication Tommy Moss gave her. After taking an asprin or two she would not complain about aches or pain for several hours most of the time.

Tommy Moss usually dispensed the asprin to her whenever she requested it. However, She could get asprin on her own.

EMOTION: at 01/10/2007 Lella Moss was sure she could control who would enter her home. She was sure she could order any one out of her her home who she did not want there. She was sure that she controled the destiny of her assets. She was sure that the people she had placed in charge of her affairs would conduct her final business as she had directed. She was content and proud with what she had been able to accumulate for her beneficaries. She was content that God had given her such a long life.

ABILITY: at 01/10/2007 Lella Moss was capable of getting asprin on her own and sometimes did. She was walking up and down a flight of stairs to the basement of the house from 3 to 4 times daily. Further on nice days she would walk about a quarter of a mile distance to the residence of Eldon Moss, of Danny Moss or the old house place.

EATING: Lella Moss was able to fix her favorite food to eat at this time: oatmeal. She could and did fixed the oatmeal dish on her own without aid. She did not attempt to fix other foods becasue this was the food she preferred to eat. She would eat breakfast around 10:00. A typical non-oatmeal breakfast would be two scrambled eggs, 3 pieces of bacon, toast and often sweet potato. Lunch would typically consist of roasted chicken, a vegestable and white or red potatoes.

COMMUNICATION: Lella Moss was able to tell Tommy Moss, Eldon Moss or anyone else what she wanted done. Give instructions, was aware of her enviroment, and felt in control of her life. She was not able to deal with a person who intended to ignore her instructions because of her limited physical strength. She was very much capable of knowing that a person was going agains her instructions. She was capable to telling a person to 'get out of my house'.

ROUTINE: Lella Moss normal routine during late 2006 was to sleep from about 6 am to about 2 pm during the day. She woke up and eat when breakfast was prepared by Tommy Moss 10 am. At around 3:00pm she would begin to get hungry and dinner was usually prepared and eaten before 4 pm. During this time she watched Dr. Phil and some of Ophra. After eating she would do whatever she wanted to do until she became tired. She attempted to go to bed around 8 pm but would get up often. At 12 am she would usually have coffee and visit with Tommy Moss and then return to the basement often during the night hours mostly to have a new place to walk around. She would not go to sleep soundly until around 7am.

BACK TO THE STORY

Tommy Moss had prior plans to be in Cookeville on the day the appointment was scheduled for Lella Moss. Tommy Moss went by the Dr. Sidrys office 30 minutes before the appointed time of 1:xx. He found

no one there.

Tommy Moss visited the waiting area on the basement and first floor several times to make sure Lella Moss was not waiting outside the office area Looking for her or her grandsons.

Tommy Moss called the hospital admissions office from the lobby to see if Lella Moss had been admitted to the hospital and found at about 2:00pm that she had not been admitted.

Later that night Tommy Moss was told by Eldon Moss that Lella Moss had been put in the hospital for the night and would be released the next day.

On Saturday Tommy Moss determined that Lella Moss was not going to be relesed from the hospital as stated by Eldon Moss, Tommy Moss went to the hospital to visit her and see the doctor.

At the hospital he discovered from the doctor Sidrys that she had been put on OXYCOTIN for pain, and

that Lella Moss had Cancer through out her body, and because of her age and the extent of the cancer, doctor Sidrys did not recommend any medical treatment.

Tommy Moss could have taken Lella Moss home on Tuesday, Jan 16, but chose not too because of his uncertainty of the effect the Oxycotin and because of the change in her physical enviroment and condition during this time would have on Lella Moss's ability to resist the coldest weather of the season .

Tommy Moss gave the hospital staff a copy of Lella Moss power of attorney for health.

On about the second visit Tommy Moss asked the hospital staff to have Nola Moss removed from the room Lella Moss occupied because of her interferrance with his visitation and the repeating of accusations of abuse she made to visitors and Doctor Sidrys in the presence of Tommy Moss.

The hospital complied with this request after Tommy Moss left the hospital that evening.

The next day a staff person told Tommy Moss, that the hospital attorney had told the staff that the 'Power of attorney for health of Lella Moss' could not be used to restrict family visitation.

A hospital staff person later threatened to remove all of the family from the room occupied by Lella Moss if they did not stop arguing because they were there for the 'best interest of Lella Moss'.

Tommy Moss limited his visitation with Lella Moss because of the verbal confrontation of Bobby Moss and Nola Moss when ever he came into the room.

On Friday Tommy Moss met with hospital social worker, Monica Bowman, to talk about the release of Lella Moss.

Ms. Bowman told Tommy Moss about the option of using a hospice group during the final days of Lella Moss life because of the demand her condition would place on him and the family. She recommended a Hospice

Organization named Caris.

She arranged for representives of Caris to meet with Tommy Moss at the hospital that morning to explain their service.

The representives of Caris met with Tommy Moss at the hospital and told him that Hospice was a voluntary program designed to help a person who was expected to die within 6 months, and their families.

They explained the resourses they could make available were medical, hygenic, psychological, and spiritual. They were careful to explain that the service was voluntary and they only provided services that Tommy Moss agreed to accept for Lella Moss.

The service was designed so that pepole could die at home with the aid of trained personnel without the need of returning to the hospital everytime the patient had a change in condition or the family became uncertain about what to do.

Tommy Moss was told he could use doctors other than those provided by Caris at any time he chose.

Caris representives provided a booklet and a contract that had in writing what they explained.

In order to have Hospice services paid for by medicare a doctor must prescribe it for his patient who has a short time to live.

This representation was made to Tommy Moss by Carise representives, the hospital nurse, and others knowledgible about medical services.

The final argument with Bobby Moss at the hospital involved wheather or not Bobby Moss was going to drive Lella Moss home instead of Tommy Moss.

Bobby Moss had been lobbing the hospital staff for the priveledge of taking Lella Moss home.

The hospital staff informed Tommy Moss about Bobby Moss desire to take Lella Moss home and indicated that Tommy Moss was responsible for making that decisions.

Tommy Moss decided that Bobby Moss could drive Lella Moss home after evauating the total situation.

The nurse on duty for Lella Moss at 4:00 gave Tommy Moss two prescriptions Dr. Sidrys has written for Lella Moss. She also gave him explanatory information about hospice use, pain, and home care.

Among these documents given to Tommy Moss by the Staff was a document which stated that Hospice had been prescribed (authorized) on an "as needed" by Dr. Sidrys .

Tommy Moss got the prescription for both drugs filled that evening and gave them to Lella Moss as prescribed. This was on 01/19/2007.

The two prescriptions were drugs for pain only. They are controlled substances under TN law and according to medical information from the internet are prescribed when the patient cannot be comforted by less potent pain medication.

Dr. Sidrys had made his hospital rounds early on 01/18/2007 and on 01/19/2007 per the nursing staff and was not available to Tommy Moss at the understood time and place to talk with him.

Dr. Sidrys had locked his office doors on 01/19/2007 between 3:30 and 3:45 so Tommy Moss had no opportunity to question him about the medication he prescribed.

Tommy Moss inquired by phone to the hospital records department about getting a copy of the hospital records on 01/22/2007 and was told by a staff person that he could not get a copy because the Lella Moss file had been marked the "power of attorney for Health' is not valid.

This new information in the file about the 'power of attorney for health' had been placed there by the hospital staff attorney or at his direction.

In discussing the medical douments filed in court by TN APS with Eldon Moss, the Hospital Document indicatged that Lella Moss vomited and was nasea in the clinic and was admitted to the hospital for that reason. ATTACH __

Eldon Moss discovered that Lella Moss had been given a drink  prior to going into Dr. Sidrys office.

The drink or its contents is the most likely reason she vomited and was sick feeling.

Tommy Moss or Eldon Moss is not aware of any time that a drink of regular coffee ever made Lella Moss ill or throw up.

During 2006 Tommy Moss only knows of one occasion where Lella Moss threw up.  That event was followed by a meal where Lella Moss ate food that was seasoned with hot sause.

The hospital social worker had Lella Moss evaluated by psychologist Dr. Averett for competency on 01/18/2007. He found that she "needs a conservator to make medical decisions".  ATTACH __

Tommy Moss has ask and has heard every child of Lella Moss ask her numerous times to let them take her to a doctor on various occasions and for various reasons, including regular check up, pain in her knee, pain in her shoulder, and renew blood presure medicine.  Lella Moss refused most of these offers to take her to a doctor. This was normal for Lella Moss through 11/2006

ADULT PROTECTIVE SERVICES RE BOBBY MOSS

Tommy Moss made telephone calls in mid 2006 to several agencies including TN APS in an effort to find one that would be able to get Bobby Moss into an involuntary counseling program. All agencies providing counseling services to adults could not work with anyone who did not volunteer for counseling on their own. Tommy Moss was told that he would have to initiate court action to force counseling. This same answer was also given in the conversatons with TN APS.

In the fall of 2006 Tommy Moss called the TN APS to talk with them again about the situation that Bobby Moss was causing at home. The conclusion of those conversation with two different individual was that they could be of no help in the situation and that my only option would be to sue or charge him with a crime personally and hope the judge

would order counseling.

Tommy Moss made calls to two attorneys about counseling for Bobby Moss. They told him that his only option was to go to court on a personal level.

Going to court to have action taken against Bobby Moss or Nola Moss would have required getting Lella Moss's cooperation in testifying because it was her residence where they caused the turmoil.

Lella Moss would not cooperate in any kind of action that involved asking the court to order counseling or set behavior limits on Bobby Moss or Nola Moss.

This kind of legal action would have been an embarrasement to her.

BOBBY MOSS AND DISRUPTIONS

The disruptions (described below) that Bobby Moss was engaging in at home did not make any practical sense in terms of achieving any family or personal goals.

Around July of 2006 Tommy Moss begin to suspect that Bobby Moss was attempting to draw him into a confrontation so Bobby Moss could accuse Tommy Moss of assault and/or battery. (See following paragraph for note on acts of Bobby Moss).

Tommy Moss's experience in Jackson County Court and jail meant to him that he would be jailed for a minimum of 6 months to a year regardless of innocence or defense.

It is believed that the sheriff and judge would do this to assist Nola Moss for as yet unknown reasons.

If Tommy Moss was jailed this would leave Lella Moss under the influence of Bobby Moss and Nola Moss at least 50 percent of the time.

On 12/04/2006 Tommy Moss had a discussion with Bobby Moss which confirmed to him that Bobby Moss was getting legal advice on how to interferr with the relationship between Tommy Moss and Lella Moss.  He replied, 'Don't worry, it will be legal.'

It is believed that Nola Moss received legal advice on how to interfer in the relationship of Tommy Moss and Lella Moss.

It is believed that She received information from the Sheriff and/or his deputies on how to accomplish this by use of criminal charges.

It is believed that Dave Hawthorne met with Bobby Moss and/or Nola Moss about arranging for Lella Moss to be taken for medical examination in 2007.

It is believed that Dave hawthorne met with Bobby Moss and/ or Nola Moss about arranging for Lella Moss to be taken for medical examination prior in 2007.

It is believed that Dave Hawthorne made arrangements with Johnny Moss to get him to take her to office visits.

A TN APS employee, Dave Hawthore, visited the residence of Lella Moss on about 01/10/2007 as a follow up to a complaint of Abuse of Lella

Moss.

Shortly after he appeared at the house Nola Moss showed up carring a
box of what appeared to be prescription drug bottles.

Nola Moss told Dave Hawthorne and Tommy Moss that she and Bobby Moss
had sneaked Lella Moss to a doctor and had been giving her medication
without telling Tommy Moss.

Dave Hawthorne knew about about the prescription medication Nola Moss
brought into the home prior to visiting the home.

Dave Hawthorne knew Nola Moss prior to this visit.

Nola Moss recognized Dave Hawthorne's car when she entered the drive.

Dave Hawthorne had a short question period with Lella Moss.  He then
asked Tommy Moss, Bobby Moss and Nola Moss to go into the Living room
out of the presence of Lella Moss.

During most of this conversation Dave Hawthorne listed as Nola Moss
repeated her accuations that Tommy Moss had choked her, controlled
Lella Moss, did not give Lella Moss medication, and would not let her
give Lella Moss medication.

Tommy Moss informed Dave Hawthorne that he had heard the same story
from Nola Moss a thousand times and that "Nola Moss was a lier".

Dave Hawthorne said he could do nothing about personal family problems.
(The same story Tommy Moss got from his phone call to TN APS.)

Dave Hawthorne informed Bobby Moss, Nola Moss and Tommy Moss. that he
was there to get them to agree to an evaluation of Lella Moss so the
state could determine the services she needed.

Dave said that Lella Moss needed a primary care physician.

Dave Hawthorne was told by Tommy Moss that he had full power of
attorney to act for Lella Moss regarding her medical needs and all
other matters as well.

Dave Hawthorne was told by Tommy Moss that Nola Moss and Bobby Moss had
developed a great deal of antimosity toward him.

Dave Hawthorne said he investigated finiancial abuse also.  He said he
had access to bank, medical and court records for any type of
investigation he needed to do.

Tommy Moss informed Dave Hawthorne that he could check with Mabry
Rehabiliation clinic regarding his ability as a care giver as Bobby
Moss had been there with severe head injury for months with Tommy Moss
managing his care.

Dave Hawthorne insisted numerous times during the first visit that the
family agree to let him have Lella Moss evaluated by his team of polite
examiners so he could decide what services Lella Moss needed.

Dave said that he was willing to move Lella Moss to a nursing home if
family issues interferred with a client.

When Lella Moss was asked by Dave Hawthorne if someone could come out

and do an evaluatin on her she said, "NO".

Dave Hawthorne dismissed any statement that Lella Moss would not want to have any services from the state.

Dave Hawthorne told Lella Moss that the services he would provide for her were free.

Lella Moss told Dave Hawthorne that Tommy Moss and Bobby Moss took care of her.

Tommy Moss showed Dave Hawthorne the medical record he kept on Lella Moss. This record contined information on daily blood pressure, medication taken, medical complaints as well as other information.

TN APS SECOND VISIT

TN APS agent Dave Hawthorne and his Supervisor, Linda Terrell, visited the residence of Lella Moss again on or about 01/31/2007. At that time they visited in the bedroom of Lella Moss at the invitation of Tommy Moss and talked with her about weddings, her bed sore, visitation of other children, and about her willingness to go see another doctor. Tommy Moss told them about the food Lella Moss was eating.

Dave Hawthorne would not recognize the 'power of attorney for health' executed by Lella Moss naming Tommy Moss to that position.

Dave hawthorne told Tommy Moss that the Tennessee Attorney General had written an opinion that said his Power of Attorney for Health was not valid.

Dave Hawthorne failed to produce this attorney General opioion after being requested to do so by Tommy Moss.

Lella Moss treated the agents with courtesy and said everyone was welcome at her house as long as they behaved themselves. Lella Moss told them she walked around her house and went to the bathroom by herself.

Lella Moss told them that she depended upon Tommy Moss and Eldon Moss to take care of her.

During this visit Agent Linda told Tommy Moss that they knew that he had filled the prescriptions for Lella Moss which had been given at the hospital and that they knew that he was keeping the medicine secure.

Agent Dave and Linda was aware that the living conditions had changed since Lella Moss had returned home. They knew Bobby Moss was not pemitted into the house. They knew that Nola Moss, Bobby Moss and Linda Harris was not allowed to visit until they met the conditions imposed by Tommy Moss.

Dave wanted to know if Tommy Moss would work with a disinterested third party to work out the differences between himself and Bobby Moss, Nola Moss and Linda Harris.

Dave and Linda both said that Adult abuse was not the problem they were there for. They were there to see that Lella Moss got the care she deserved during her last days.

Neither Dave or Linda asked Tommy Moss about the aviability of the

medication Nola Moss had displayed on Dave's first visit.

Agent Dave came up just short of saying, that Tommy Moss had to have hospice, and had to follow his prescribed medical program they devloped for Lella Moss.

Agent Linda said they would become a little more intense in their efforts to get what they wanted if Tommy Moss did not cooperate.

At this time, Dave: Linda: intentions were to force Tommy Moss to follow the medical program they wanted for Lella Moss in spite of the "power of attorney for medical treatment" held by Tommy Moss, or

in spite of what was actually needed by Lella Moss.

Agent Dave: Agent Linda: had a personal agenda regarding Lella Moss.

Any cooperation with them would only delayed their filing charges in court to bring about their agenda.

Tommy Moss ask the agents to give him a report on what they had discovered and if they had no abuse to report then quit the investigation.

Investigator Linda; Investigator Dave had not researched the bank records, or

the real estate records of Lella Moss, or

the complete medical record of Lella Moss, or

the clerk of court record on Tommy Moss, or

the Clerk of Court record on Eldon Moss, or

the Clerk of Court record on Bobby Moss, or

the Clerk of Court record on Nola Moss, or

the records of the Jackson County Sheriff.

THE THIRD VISIT TN APS

On 02/05/2007 agent Dave returned to vist Lella Moss. He was told that Lella Moss was asleep and that he could not enter the house. Dave left saying that he would be back.

By 02/08/2007 TN APS agents had made two visits to Lella Moss' home which were over an hour in length each.

By 02/08/2007 TN APS had been told by Tommy Moss that the jackson County sheriff's department had responded to 3 welfare checks at the residence of Lella Moss within the last month or two and they had found no reason for the requested check.

By 02/08/2007 the TN APS agents knew that Nola Moss was the suspected complainer to the Jackson County Sheriffs office about unneeded welfare checks and the complainer to TN APS.

The Conservator Visits

On 02/08/2007, while Eldon Moss was staying with Lella Moss, the jackson county sheriff deputies came to the residence of Lella Moss with ambulance personnel. They took Lella Moss from her residence to an undisclosed location.

She ask them not to take her. She told them she did not want to go.

The removal occured also over the request by Eldon Moss that they not take Lella Moss from her home.

Eldon Moss was held by deputies as they carried Lella Moss out on a cot.

Tommy Moss, the holder of the power of attorney for health and the durable power of attorney for finance was not present and would not have given persmission for Lella Moss to be removed anywhere.

Testimony by Kelly Tayes said the undisclosed location was a Hospital.

about The Complaint for Protective Services

On 02/08/2007 Tennessee adult protecive services had secured an order from Judge CK Smith to remove Lella Moss from her home because of 'imminent danger'. page 2 no 6.

This need and fact was sworn to by TN APS agent Dave Hawthorne.

TN DHS Attorney Bass filed the sworn statement of Dave Hawthorne

Francis Bass, Jr. represented ( made an oath) to the court that he had investigated the validity of the affidavits and pleadings and found them to be accurate and reliable for this "protective order" action.

Francis Bass, Jr approved the filing to be in accordance with TN LAW, and

the TN DHS APS policy of using the least intrusive means to accomplish the departments legal objectives.

TN DHS APS supervisors who approved the filing of this "protective order action" represented that it complied with: TN LAW, and

department policy, and

proper investigation.

TN DHS APS supervisors and attorneys approved the filing as the use of the lest intruive means to accomplish the departments legal objectives.

On 02/09/2007, the day after Lella Moss was forceable removed from her residence by TN DHS ADS, Tommy Moss secured a copy of the TN APS plea in the case from the clerk and master at Jackson County.

start initial pleading documents

The Documents in the file at that time was the initial complaint, "Complaint for Authorization to consent to Protective Services", with three attachments 'Physician's Statement of Need for Court Ordered Protective Service", dated 02/01/2007 'Medical/ psychiatric/ psychological Examination Report for Establishment of Conservatorship T.C.A. 34-3-105' dated 02/02/2007 and 'Cookeville Regional Medical

Center Discharge Summary' date 2/06/2007, The "Emergency Temporary Order" dated 02/08/2007. and the "order appointing counsel and setting hearing" dated 02/08/2007.

The sworn 'Physician's Statement of Need for Court Ordered Protective Service" states (in part):

the patient is in immenent danger for the following reason:

Pat(ient) not getting last needs met, REPORTEDLY, not being given pain Med(ication), etc. item 3.

Prognosis for patient without treatment is: poor 2 to 4 months. item 5.

"She is in need of the following Services: "home health or nursing home," item 4. and

The sworn "Medical/ Psychiatric/ Psychologiacal Examination Report for Establishment of Conservatorship" states (in part):

I believe that Lella Moss should have a conservator for the following reasons:

'She has lost the ability to understand the consequences of her decisions. She is not capable of making decisions that are in line with her wish to live indepenteendly from the help of others. .... Her diagnosis is cognite disfunction.

"She needs a conservator to make medical decisions". item 6.

The unsworn compilation of data, 'Cookeville Regional Medical Center Discharge Summary' states (in part) (restate for reading):

"the patient's discharge was delayed because one family member accused another of physical and mental abuse of the Patient."

"the patient's son had a drafted power of attorney which social services and TN APS thought was binding at the time (of discharge)

"the patient was discharged to hospice and to the care of the son with the power of attorney'

"discharge medication in charts: Oxycotin and Oxycodone'. page 2.

The two medical affidavits were prepared in advance of Dave Hawthorne's 02/05/2007 visit to the residence of Lella Moss.


The TN APS service filed the removal action using "imminent Danger" (plea no 6) language of TN stature 71-6-107.

The only change in the living conditions of Lella Moss on 02/08/2007 compared to 1/31/2007 was the removal of Bobby Moss as a resident of the home and a much cleaner house.

Her medical condition, prescription medication, and care givers remained the same.

The visits to the residence of Lella Moss by TN APS agents was made 01/10/2007, 01/31/2007 and 02/05/2007 and the removal occured on

02/8/2007. This means that 21 days elapsed between visit one and two, another 5 days elapsed between visit two and visit three, and another 3 days elapsed before the filing of the protective action.

The TN DHS APS action states ( plea no 9) that Tommy Moss had not filled the pain medication prescription ordered by Dr. Sidrys.

Agent Dave; Agent Linda; admitted and knew that the prescription had been filled on the second visit to the home.

Dave Hawthorne; Linda Terrell; Francis Bass, Jr.; knew prior to filing their legal action that Lella Moss had a power of attorney for health which allowed Tommy Moss to act for her.

The TN DHS APS action states ( plea no 4) that Lella Moss suffers from self neglect; neglect and that Lella Moss is not able to provide or obtain the services necessary to maintaing her health or welfare.

Dave Hawthorne: Linda Terrell: had visited the home of Lella Moss and knew that Lella Moss was well taken care for.

The TN APS action states ( plea no 5) that Lella Moss lacks the mental ability to make rational decisions regarding her need for protective services.

Dave Hawthorne: Linda Terrell: Francis Bass, Jr.: knew prior to filing the action that Lella Moss had a power of attorney for health which allowed Tommy Moss to act for her.

The Tn DHS APS action states ( plea no 6) that placing Lella Moss on morphine produced a dramatic improvement in her comfort.

This statement totally mistates the statement in the medical record which says only that "her improvement occured over a 24 to 48 hour perod." This may or may not have been due to the administrtion of Morphine. Getting sleep alone may have produced the same improvement.

The TN DHS APS action states ( plea no 7) that all reasonable alternatives to placing Lella Moss in the legal custody of Kelly Tayes were exhausted.

This reasonable effort did not include getting a judicial order requireing Tommy Moss to produce receipts for the drugs; or

a judicial order requireing Tommy Moss to administer a predetermined amount of pain medication.

This reasonable effort did not include:

 a plain statement from Clares or DR. Sidrys that Hospice was required.

does not include a produced statement from the legal department of TN DHS or the attorney general of Tennessee that the Power of Attorney held by Tommy Moss is/was invalid; or

that Tommy Moss could not decide under the Power of Attorney for health what the comfort level of Lella Moss would be; or

that the amount of medication that would be necessary to applied to maintain a certain level of comfort could not be determine by Tommy Moss alone under the Power of Attorney for health; or

that a court order could have been issued to require the Tommy Moss to agree to the use of Caris Hosipice servie.

The TN APS action recharacterizes ( plea no 6) the terminal diagnoisis of Lella Moss cancer in such a way that that it is the 'imminent danger' they will save her from.

The TN APS action says that Lella Moss know relatives are not appropriated to provide sufficient protection for the respondent.

In 2003 Lella Moss executed Health Care directives, and powers of attorney which specifically mentioned her children as her choice of persons to protect her interest.

The relatives of Lella Moss known to TN DHS APS and selected by her would not allowed TN DHS APS to dictate what was to be done with Lella Moss.

TN APS did not talk with Eldon Moss or Danny Moss regarding providing the services the Department wanted to give Lella Moss.

The 'Emergency Temporay Order' dated 02/08/2007 appointing Kelly Tayes as the person to consent to protective services for Lella Moss' and "having authority to take Lella Moss into physical custody and consent to medical, blood test or psychological test deemed necessary'.

The order also appointed Kelly Tayes for a period of six months as guardian for the purpose of securing and disbursing Lella Moss resources to defray the cost of medical or nursing care facilities. page 2 no 4.

The order said "for good cause' all powers of attorney executed by Lella Moss are revoked. There is no facts statement of what the 'for good cause' is. page 2 last paragraph

The temporaty order does not require Kelly Tayes to perform any specific act.

The judicial "'order appointing counsel and setting hearing"' also dated 02/08/2007 stated:.

Michael Collins ( Carthage, TN) is appointed counsel for Lella V. Moss to defend this caue of action and receive service of process for respondent.

Michael Collins is entitled to examine all medical, psychological, psychiatric and financial records of Lella Moss.

The place for the hearing in this order is in Wilson County, Tennessee. This is in the second county west of Jackson County, Tennessee and a round trip of about 2 hours.

There was no certification of notice of hearing to any family member in the file for the pre set date of 02/13/2007 on a separate document or as part of the complaint.


End of initial pleading documents

The services requested by the TN DHS APS are not provided by the department but are transferred to Private parties selected by the department: That is a Private Conservator, a Private Attorney and a Private Guardian ad Litem.

Lella Moss pays for these services from her private fund by order of the court.

Attorney Bass has filed the same basic general pleading for 10 years or more in most of the cases where he has attempted to take an adult into protective services for TN APS.

Dave Hawthorne: Linda Terrell: and other agents sign a standed oath form in each case.

The pleadings made by TN DHS APS are made before the same judges, involve the same legal issues, and recommend appointing a limited group of individuals to act as conservators and/ or guardians year after year. The Judge gets to select the attorney ad litem and disaprove of the TN DHS APS recommendation for conservator and maybe appoint an attorney instead.

Francis Bass, Jr. has been filing complaints to take individual into protective custody before Judge C. K. Smith since 1997.

Kelly Tayes has been routinely appointed conservator in the uppercumberland area cases.

The results of state protective custody ruling are similar for adults with assets: the state appointee are in, court approved maintance expenses become astromonical, assets of the protected person are liquidated at below market prices to pay for forced service, the state protected person's natural beneficiaries are left with little or no inheritance.

The TN DHS APS action in this case resultes in:
violation of Lella Moss's constitutional right of libety;
violation of her right to unreasonable search and seasure;
violaton of her right to privacy;
violation of her right to be free of unnecessary government intrusion;
violation of her right to to carry out her religious mission in life;
providing services to Lella MOss that she already had;
reduces the inheritance Lella Moss had available for her chosen heirs;


FINANCIaL EXPLOITATION

TN APS says that Lella Moss may have been financially exploited.

Lella Moss had filed and registered at the court house quit claim deeds to her real estate to a trust created and last restated by her on 04/01/2003. These are public records.

Lella Moss had placed her banking accounts in the name of her trust last restated on 04/01/2003.

Lella Moss has had her banking accounts with the same institutions for years.

These financial records could have been reasonably obtained by TN DHS

APS agent without obtaining a protecive order for Lella Moss or terminating the Powers of Attorney executed by her.

TN APS could have reasonably determined if financial exploitation or financial fraud existed with minimual effort on the part of TN APS without obtaining a protective order for Lella Moss.

TN APS states that Lella Moss may have been finacially exploited ( plea no 4).

TN APS has selected and forced upon Lella Moss and her beneficiaries service that will cost Lella Moss $18,000 per month ( 216,000 anually) per testimony of kelly Tayes, the court appointed conservator recommended by TN APS.

The services being provide to Lella Moss under the State of Tennesse Plan include:
24 hour per day security service,
using deputies from the jackson County Sheriff Department, and
Emergency Resque department who are also auxillary deputies,
 24 hour per day nursing care to administer Oxycotin pills, cook and clean,
the personal sevice of kelly tayse in several capacities, and
 the personal services of an attorney guardian ad litem, Michael Collins.

To Ensure these services are paid from the assets of Lella Moss , the Power of Attorney for Health, the Durable Power of Attorney for Finance, and her successor trustess to her trust were set aside.

The TN DHS APS would not initiate "protective services action" in this cases if the state of Tennessee had to pay for the servicdes.

Lella Moss was providing the same service from her personally designated representive for under $20,000 per year.

Under the TN DHS APS services:

Lella Moss is kept under the influene of narcotics;

Lella Moss vital signs are check routinely;

Lella Moss is given other medication besides Pain Medication;

Lella Moss is isolated from from her Children;

Visiting by family and friends is discouraged by the presence of deputies;

Lella Moss is touched by individuals she does not want in her home;


THE POWERS OF ATTORNEY FOR HEALTH ( POAH):

Lella Moss exectued a modified form document for appoining a power of attorney for health. The document was provided by a legal aid offices in Tennessee and from the internet.

Lella Moss's Power of attorney for health was signed by Lella Moss and

notarized on 04/15/2003. The Power of attorney for health became effective when signed. Tommy Moss is the designated agent.

In order to ensure taht document used the least restrictive language on the Agent, the phrase "I intend that this person ( POAH) shall have the broadest discretion and power allowed by law to approve, refuse and stop medical treatment. " was added.

The Power of Attorney for Health gives the names of the persons Lella Moss chose as backups to Tommy Moss should he resign, become ineligible or die. These eligible chosen of Lella Moss in waiting are Eldon Moss, Danny Moss and Linda Harris.

There is no court pleading naming Tommy Moss or a successor to his position under these documents as a respondent in a proceeding to remove him from his duties under a Power of Attorney for Health.

TN Statute says POAH takes presidence over the court appointed position of conservator.

Tommy Moss showed the regular doctors who treated Lella Moss the POAH so they could note or copy the document for future use.

Tommy Moss's authority under this document was terminated in a ex parte temporary hearing order made 02/08/2007 and made permanent by written judicial order dated 02/16/2007.

The Power of Attorney for Health is a valid document. It expresess the wishes of Lella Moss. The execution is reliable.

DURABLE POWER OF ATTORNEY FOR FINANCE ( POAD)

The durable power of attorney for finance was executed by Lella Moss and notarized on 04/15/2003. The ' durable power of attorney for finance' was effective when signed. the agent appoointed was Tommy Moss.

The durable power of attorney for finance gives broad powers to the holder of the position to handled financial matters in the same way the grantor would and "execute any written instrument regardless of the nature". Several specific categories, but not all, where this power might be uses is enumerated in the docment.

Tommy Moss is granted the power to act for Lella Moss by the docmuent. Eldon Moss, Danny Moss Linda Harris are the eligible named successors in waiting should Tommy Moss resign, fail to act or become incompetent.

The Power of Attorney for finance is a valid power of attorney. It expresses the wishes of Lella Moss. The execution is reliable.

There is no court pleading naming Tommy Moss or a successor to his position as a respondent in a court proceeding to remove him from his duties under the durable Power of Attorney of Lella Moss signed 04/15/2007.

The durable power of attorney for finance also gives a list of names of Lella Moss designees who were to be appointed conservator of the person of Lella Moss if it became necessary to appoint one.

Prior to 01/18/2007 Tommy Moss executed legal docments at the direction of Lella Moss using the durable power of attorney only for the purpose

of convience for Lella Moss.

Tommy Moss authority under this document was terminated at a temporary
hearing order made 02/08/2007 and made permanent by written order dated
02/16/2007 at another ex parte hearing.

THE TRUST OF LELLA MOSS DATED 04/01/2003

Lella Moss executed several trust agreement from 1985 to 2003. The 2003
trust agreement amended all prior trust agreements of Lella Moss by
restatement of the trusts and revocation of prior trust documents.

The trust docment names Lella Moss as the trustee and Tommy Moss as the
administrative trustee with the power to act for the trustee while
competent. The docment names Tommy Moss as the sole successor trustee
and Eldon Moss and Wesley Moss as the successor trustees in waiting. In
addition to these alternatives Danny Moss and Linda Harris are also
named.

The trust is a valid trust.

The only assets held under the trust agreemet prior to 2004 or 2005 was
a bank account. In 2005 Lella Moss decided that she should use the
trust instrument to carry out her final wishes and transferred all of
her assets into this trust.

The acts taken by Tommy Moss regarding this trust prior to 01/18/2007
were at the direction of Lella Moss. After 01/18/2007 Tommy Moss may
have paid monthly bill as trustee, nothing more. At 02/15/2007 Tommy
Moss had been trustee for only 28 days.

The trust has terms protecting assets from creditors by limiting
distributions to beneficiaries of the trust.

The terms of the trust authorize the trustee, in this case, to withold
payment for unnecessary government services.

Docments executed with the trust express Lella Moss Life's purpose.

Judge Smith appointed Kelly Tayes as the successor trustee to the Lella
Moss trust dated 04/01/2003 on 02/16/2007.

He authorized Kelly Tayes to disburse funds from the trust.

An up to date 'certificate of trust' is on file at each place Lella
Moss has banking business.

KELLY TAYES

Kelly Tayes was recommended by TN APS and approved by the Judge Smith.

Kelly Tayes had Lella Moss forcefully removed from her home on
02/08/2007.

Kelly Tayes keep the location of Lella Moss and condition of Lella Moss
from her children during the period of removal from 02/08/2007 to
02/21/2007 (12 days).

On 02/12/2007 Kelly Tayes left a message on the phone of Tommy Moss

that Lella Moss wanted her false teeth.   This call was made to Tommy Moss four days after the Lella Moss was taken from her home by state appointed agents`.

Kelly Tayes took control of assets in the Lella Moss trust dated 04/01/2003 in February 2007.

Kelly Tayes used assets of the Lella Moss trust to pay for services she chose to provide for Lella Moss.

Kelly Tayes selected the persons to provide services and determined the amount that she would pay for the service.

Kelly Tayes required the children to Lella Moss to sign a visitation agreement before they are permitted to visit Lella Moss.

The visitation agreement sets a definite visitation time of 30 minutes each day, prohibits discussion with Lella Moss of her finances, business affairs, prohibits negative comments about family members or the Conservator or the Court Appointed Attorney.

The visitation agreement prohibits discussion of any topic that upsets Lella Moss.

The visitation agreement prohibits asking question of the sitters, hospice workers or other staff staying with Ms. Moss.

The visitation agreement prohibits the taking of any type of recording device on the property during visitation.

The visitation agreement prohibits anyone accompaning a child of Lella Moss on a visit unless approved by Kelly Tayes in advance of the visit.

TN APS plead that Tommy Moss had keep ( secreted) family away from Lella Moss. Pleading filed 02/16/2007, Complaint, Item III.

Tommy Moss actions in regard to limiting visitation with Lella Moss applied only to three of the six children.

Children who visited Lella Moss could discuss any topic, video or tape any conversation and ask anyone questions about Lella Moss or her condition.

Tommy Moss had arranged for many relatives to visit Lella Moss before he was removed by the courts.

Kelly Tayes hired sheriff deputies and others as guards for the 24 hour per day confinement of Lella Moss.

Lella Moss has told jackson county sheriff deputies to stay off her property without a search warrant in 2005.

Prior to Kelly Tayes there was no need for guard service at the residence of Lella Moss.

Kelly Tayes has said the guard service will remain until all of Lella Moss children sign her visitation agreement.

Kelly Tayes has hired nurses ( or semi professionals) to be with Lella Moss at her home 24 hours per day.

Proir to Kelly Tayes there was no need for nurses (or semi professionals) in the home of Lella Moss.

Kelly Tayes had Lella Moss subjected to medical test that Lella Moss would have oppose or her chosen representives would have not consented to on her behalf.

Kelly Tayes had Lella Moss subjected to medication that Lella Moss would have oppose taking or her chosen representives would have not consented to on her behalf.

Kelly Tayes had Lella Moss subjected to medical procedures that were unnecessary for her medical care.

Kelly Tayes removed mail addressed to Tommy Moss at 200 Sugar Town Ridge Lane from the mail box.


THE APPOINTED ATTORNEY FOR LELLA MOSS


On 02/08/2007 Judge Smith appointed Michael Collins, attorney of Carthage, Tennesss as the Counsel for Lella Moss to defend the casue of action and to receive service of process.

Mr. Collins appears to be an experience attorney.

He was given the right to examine medical, psychological, psychiatric and finacial records of Lella Moss.

The Power of Attorney for Health was readly available to Mr. Collins from TN APS and from Cookeville Regional Medical Center.

The Durable Power of Attorney for Finance and the Certificates of Trust was available from Places Lella Moss Banked.

Mr Collins could have secured court assistance in securing any documents related to Lella Moss.

Mr. Collins knew of the hiring of Jeff Land to represent Tommy Moss and Lella Moss at the hearing by 02/13/2007.

Mr. Collins appeared at the hearing on 02/15/2007 stating that Lella Moss had not communicated with him and that he knew very little about her.

Mr. Collins was given a copy of the Lella Moss Power of Attorney for Health and her durable Power of Attorney for Finance at the 02/15/2007 hearing.

During the 02/15/2007 hearing Mr. Collins made no attempt to support the written power of attorneys which contained the expressed wishes of Lella Moss .

Mr. Collins expressed no support during legal argument for the Powers of attorneys of Lella Moss.

During witness examination Mr. Collins did not attempt to bring forth evidence that would support the written wishes of Lella Moss.

Mr. Collins did not call any witness of his own to support of the know wishes of Lella Moss.

Mr. Collins did not question witness who appeared for TN APS in order to discredit their testimony.

He did not question witness, who were at the hearing to support the wishes of Lella Moss, in such a way as to bring forth evidence that would support the written documents of Lella Moss.

Mr. Collins did raise the question regarding withholding of medication (asprin) at the hearing on 02/15/2007.

Mr. Collins made no statements about the tennessee laws that would be violated by permitting the hearing under the 'imminent danger' pleading TN APS filed under.

Mr. Collins made no statement to discredit the "imminent Danger" pleading or the evidence used to support this plea.

Mr. Collins made no statements about the tennessee laws that would be violated by voiding Lella Moss's Power of attorney for Health and her Power of Attorney for Finance.

Mr. Collins made no statment to support the alternative designees named by Lella Moss should one fail to qualify.

THE JUDGE:

C. K. smith is an experienced chancery court judge and lawyer.

C. K. Smith oral ruling was that the issue of Tommy Moss serving as trustee was not before the court. The written order terminated the trusteeship of Tommy Moss and appointed kelly Tayse, the conservator as the successor trustee.

The judge did not file the final written order dated on 02/16/2007 with the clerk of Court in jackson county by 02/23/2007.

Copies of the 02/16/2007 written order went to banking institutions by 02/20/2007 so Kelly Tayes could take control of the trust funds.

There was no medical expert at the hearing.

C. K. Smith acted as an unsworn witness in the proceeding because his oral and written judgement reflect facts not testified to by a medical expert or a witness.

Both of his orders include the following medical finding:

that asprin was prescribed for Lella Moss;

asprin would make Lella Moss comfortable and pain free;

that asprin was safe for Lella Moss to take;

that Lella Moss would need asprin for pain relief while taking the much more potent Oxycotin.

C. K. Smith discussed with TN APS how and what he would consider in order to terminate Tommy Moss as trustee of the Lella Moss trust with

TN APS personnel after the conclusion of his oral order.

C. K. Smith terminated the Trusteeship of Tommy Moss and othrs without pleadings, notice or hearing on the matter.

C. K. Smith terminated the Agent Status of Tommy Moss and others under the power of atttoreys without Pleading, notice or hearing on the matter.

C. K. Smith found two witness for the TN APS testimony was so unbelievable that C. K. Smith laid his head on his desk through part of there testimny so as to conceal his impulse to laugh.

C. K. Smith stated that he would spend every last penny of Lella Moss,s money before she dies to see that she gets an asprin for her comfort. He said he "did not care about the amount of money left for her children to inherit".

There was no testimony on the level of comfort Lella Moss would chose over leaving every last penny she accumulated to her chosen beneficiaries.

C. K. Smith conducted insured that TN APS achieve their personal objectives and defeat the plans of Lella Moss.

C. K. Smith executed orders and granted authority in this case which violation of Tennessee Law, Tennessee Constitution and the constitution of the United States.

C. K Smith permitted another hearing in this matter on March 8, 2007 at the request of TN DHS APS as an "amended petition for appointment of a conservator". Mr Collins and Mr. Bass were the only two attorneys present. The Court adopted the record from the February 8, 2007 hearing and wrote an new order.

The significant difference in these two written rulings is the last one found the evidence to be "clear and convincing" as opposed to only by a "preponderance" in the initial ruling.

TN DHS APS was relieved of all responsibiliy in the case as they do not represent the conservator.


SECTIONS OF THE TN STATUTES APPLICABLE WHICH ARE INCORPORATED BY REFERENCE

§ 32-11-101. "Tennessee Right to Natural Death Act."


TCA§ 32-11-102. Legislative intent (a) The general assembly declares it to be the law of the state of Tennessee that every person has the fundamental and inherent right to die naturally with as much dignity as circumstances permit and to accept, refuse, withdraw from, or otherwise control decisions relating to the rendering of the person's own medical care, specifically including palliative care and the use of extraordinary procedures and treatment.

TCA 32-11-105 Forms The declaration may be substantially in the following form, but not to the exclusion of other written and clear expressions of intent to accept, refuse, or withdraw medical care.

§ 32-11-109. Any person who willfully conceals, cancels, defaces, obliterates or damages the declaration or revocation of another without such declarant's consent, or who falsifies or forges the same shall be civilly liable and subject to criminal prosecution for a Class C misdemeanor, and if a provider, subject to administrative and professional discipline.

§ 34-6-201. "Durable power of attorney for health care"

§ 34-6-201. Definitions As used in this part, unless the context otherwise requires: (1) "Durable power of attorney for health care" means a durable power of attorney to the extent that it authorizes an attorney in fact to make health care decisions for the principal; (2) "Health care" means any care, treatment, service or procedure to maintain, diagnose or treat an individual's physical or mental condition, and includes medical care as defined in § 32-11-103(5); (3) "Health care decision" means consent, refusal of consent or withdrawal of consent to health care; (4) "Health care institution" means a health care institution as defined in § 68-11-102; (5) "Health care provider" means a person who is licensed, certified or otherwise authorized or permitted by the laws of this state to administer health care in the ordinary course of business or practice of a profession; and (6) "Person" includes an individual, corporation, partnership, association, the state, a city, county, city and county, or other public entity or governmental subdivision or agency, or any other legal entity.

§ 34-6-202. Applicability of part (a) A durable power of attorney for health care executed after July 1, 1991, is effective to authorize the attorney in fact to make health care decisions for the principal only if the power of attorney complies with this part.

(e) Any durable power of attorney for health care properly executed before May 5, 1995, shall be enforceable notwithstanding any failure to notarize signatures of witnesses thereto.

§ 34-6-203. Requirements (a) An attorney in fact under a durable power of attorney for health care may not make health care decisions unless all of the following requirements are satisfied: (1) The durable power of attorney for health care specifically authorizes the attorney in fact to make health care decisions; (2) The durable power of attorney for health care contains

the date
of its execution; and (3) The durable power of attorney for health care
is
executed by the following method: the durable power of attorney for
health care
is signed and acknowledged before a notary public by the principal and
is signed
by at least two (2) witnesses who witnessed the signing of the
instrument by the
principal, with each witness making the following declaration in
substance:

§ 34-6-204. Priorities and preferences; appointment of conservator,
guardian of
estate or other fiduciary (a)(1) Unless the durable power of attorney
for health
care provides otherwise, or unless a court with appropriate
jurisdiction finds
by clear and convincing evidence that the attorney in fact is acting on
behalf
of the principal in bad faith, the attorney in fact designated in such
durable
power of attorney who is known to the health care provider to be
available and
willing to make health care decisions has priority over any other
person to act
for the principal in all matters of health care decisions.

in part 1 of this chapter, if a court appoints a conservator, guardian
of the
estate or other fiduciary, such fiduciary shall not have the power to
revoke or
amend a durable power of attorney for healthcare nor replace the
attorney in
fact designated in such power of attorney.

(B) Upon application and good cause shown, when appointing such
fiduciary, a
court may revoke or amend a durable power of attorney for health care
or replace
the attorney in fact designated in such power.

§ 34-6-205. Warnings

In addition, a court can take away the power of your agent to make
health care
decisions for you if your agent: (1) authorizes anything that is
illegal; or (2)
acts contrary to your desires as stated in this document.

§ 34-6-207. Revocation

(a) The principal may,

§ 34-6-217. (a) A durable power of attorney for health care entered
into before
July 1, 2004, under this part shall be given effect and interpreted in
accord
with this part.

§ 68-11-1801. "Tennessee Health Care Decisions Act."

§ 68-11-1802. Definitions (1) "Advance directive" means an individual
instruction or a written statement relating to the subsequent provision
of
health care for the individual, including, but not limited to, a living
will or
a durable power of attorney for health care;

(2) "Agent" means an individual designated in an advance directive for
health
care to make a health care decision for the individual granting the
power;

(5) "Guardian" means a judicially appointed guardian or conservator
having
authority to make a health care decision for an individual;

(7) "Health care decision" means consent, refusal of consent or
withdrawal of
consent to health care;

(10) "Individual instruction" means an individual's direction
concerning a
health care decision for the individual;

(11) "Person" means an individual, corporation, estate, trust,
partnership,
association, joint venture, government, governmental subdivision,
agency, or
instrumentality, or any other legal or commercial entity;

(14) "Power of attorney for health care" means the designation of an
agent to
make health care decisions for the individual granting the power;

(18) "Surrogate" means an individual, other than a patient's agent or
guardian,
authorized under this part to make a health care decision for the
patient; and

§ 68-11-1803. (b) The advance directive must be in writing and signed
by the
principal. The advance directive must either be notarized or witnessed
by two
(2) witnesses.

68-11-1807.
 (a) Absent a court order to the contrary, a guardian shall comply
with the patient's individual instructions and may not revoke the
patient's advance directive.

 (b) Absent a court order to the contrary, a health care decision of
an agent takes precedence over that of a guardian.

 (c) A health care decision made by a guardian for the patient is
effective without judicial approval.

68-11-1811. Violations; damages

(a) A health care provider or institution that intentionally violates this part is subject to liability to the aggrieved individual for damages of two thousand five hundred dollars ($2,500), or actual damages resulting from the violation, whichever is greater, plus reasonable attorney's fees and costs.
s 71-6-101. "Tennessee Adult Protection Act."

s 35-01-101 Uniform Trust Code


RULES OF TENNESSEE DEPARTMENTS APPLICABLE


RULES OF THE TENNESSEE DEPARTMENT OF HEALTH BOARD FOR LICENSING HEALTH CARE
FACILITIES, CHAPTER 1200-8-27, STANDARDS FOR HOMECARE ORGANIZATIONS PROVIDING

HOSPICE SERVICES.

Definitions:

(3) Advance Directive. An individual instruction or a written statement relating
to the subsequent provision of health care for the individual, including, but
not limited to, a living will or a durable power of attorney for health care.

(4) Agent. An individual designated in an advance directive for health care to
make a health care decision for the individual granting the power.

(25) Health Care Decision-maker. In the case of a patient who lacks capacity,
the patient's health care decision-maker is one of the following: the patient's
health care agent as specified in an advance directive, the patient's court-
appointed guardian or conservator with health care decision-making authority,
the patient's surrogate as determined pursuant to Rule 1200-8-27-.13 or T.C.A.
§33-3-220, the designated physician pursuant to these Rules or in the case of a
minor child, the person having custody or legal guardianship.

(45) Patient. Hospice patient means only a person who has been diagnosed as
terminally ill; been certified by a physician in writing to have an anticipated
life expectancy of six (6) months or less; has voluntarily through self or a
surrogate requested admission to a hospice; and been accepted by a licensed
hospice.

(52) Power of Attorney for Health Care. The designation of an agent to make
health care decisions for the individual granting the power under T.C.A. Title

34, Chapter 6, Part 2.

REGARDING STATE REGULATION

The Regulation above state that a Hospice organization can only provide
services to a persons who voluntarily (by self or by agent) agrees to
the service.

s****

## DAMAGES

§ 1983. Civil action for deprivation of rights

Lella Moss Has been deprive of the right to contract for services she
desires.

The Right to be free from unwarranted government intrussion.

Lella Moss has been deprived of the right liberty.

Lella Moss has been deprived of property and its use.

Lella Moss has been deprived of her right to exercise her religious
freedom.

Lella Moss has been deprive of the 4th amendment right to be free from
unreasonable search.

Lella Moss has been deprived of the right to privacy in the conduct,
use, holding and/or distribution of her property.

Lella Moss has had property converted for uses she or her appointed
agents did not authorized.

Lella Moss has suffered emotional damage from the disregard of her
private expressions and writings.

Lella Moss has suffered emotional damage from the intrusiton of
government into her businesss.

Lella Moss has suffered emotional damage from the intrustion of private
parties on her property and into her business.

Lella Moss has been deprived of services by her persons she loves and
is emotionally attached to.

Lella Moss claims that Cookeville Regional Medical Center has failed to
honor and abide by the term of her written advanced directives.

Lella Moss Claims that the Commissioner of Department of Human Serves,
the Attorney in charge of the department, Francis Bass, Jr, supervisors
of Linda Terrell, Linda Terrell, Dave Hawthorne have negated her
written directives.

Lella Moss has and is being kidnapping by kelly Tayes, Dave Hawthorne,
C.K Smith, other unknown persons and held against her will.

Lella Moss claims assault and battery by Kelly Tayes and other unknown
persons.

Lella Moss claims that Dave Hawthorne, Linda Terrell, and Francis Bass, Jr. have commited fraud and purjury inregard to her need for services and in failing to recognize her written directives.

Tommy Moss, Eldon Moss and Danny Moss claim a 1st amendment violation of 1st amendment practice their convictions regarding "honoring a parent'.

Tommy Moss, Eldon Moss, and Danny Moss claim a 14th amendment violation of to due process of law and the taking of assets

Tommy Moss, Eldon Moss, and Danny Moss claim in a violation of the right to life liberty and pursuit of happines.

Tommy Moss claims the forced removal from property he controlled in trust created by Lella Moss in 2003.

Lella Moss enjoyment of her chose persons providing her care, suport and property management.

in the forced habitation of Lella Moss residence by people she does not want there.

in the loss of confidence in the Court System and the State to protect, preserve and defend the rights of its citizens to be free from unwanted government intrusion.

Tommy Moss, Eldon Moss Danny Moss Linda Harris Amand Harris and other grand children have been deprived of the enjoyment of caring for Lella Moss when she is limited in her ability to care for herself.

Tommy Moss has been deprived of the enjoyment of caring for Lella Moss in an enviroment free from the distractions of Bobby Moss and Nola Moss.

Tommy Moss has been deprived of funds for the defense of Lella Moss and her assets and himself as her appointed successor Trustee.

Lella Moss, Tommy Moss, Eldon Moss Danny Moss and others have suffered emotionally from the removal of Lella Moss from her home and property, removal of Tommy Moss from his home, office and property, the medical treatment and testing imposed upon Lella Moss, the insensitivity of court appintees, the conduct of court appointees, the conduct of the C. K. .

Lella Moss, Tommy Moss, Eldon Moss and Danny Moss have suffered financil loss as a result of the acts of Kelly TAyes, The acts of Cookeville Regional Medical Center court action, Dave Hawthorne, Linda Terrell, Francis Bass, Jr. and others .

Tommy Moss as trustee of Lella Moss trust dated 04/01/2003 has suffered finacial loss of various kinds.

us Sec. 241. Conspiracy against rights
us Sec. 1961 RICO violations

RELIEF SOUGHT:


Injunctive relief the TN DHS.

The maximum award possible including cost, attorney fee, punitive damages.

such other and further relief as the Court deems just and proper.

Respectfully submitted,

April 3, 2007

Tommy Moss
3857 MOrrison creek Road
Gainesboro, TN 38562

No phone